UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROSALIE C. SARRO, Individually )
    and as Administratrix of )
    the Estate of Linda A. )
    Rivers, )
        Plaintiff, )
         )
        v. ) C.A. NO. 08-10224-MLW
         )
PHILIP MORRIS USA INC., )
        Defendant. )
         )

## MEMORANDUM AND ORDER

WOLF, D.J.                                                         March 7, 2012

I. SUMMARY

On December 24, 2004, Linda Rivers ("Rivers"), who lived alone, died in a fire at her home in Revere, Massachusetts. Rivers co-owned her home with her cousin, Rosalie Sarro ("Sarro"), the administratrix of Rivers's estate and the plaintiff in this case.

On December 20, 2007, Sarro filed a complaint in Essex Superior Court against Philip Morris USA, Inc. ("Philip Morris"), alleging that Philip Morris's defective design and manufacture of cigarettes caused the fire in which Rivers died. Philip Morris timely removed the case to this court pursuant to 28 U.S.C. §§1441 and 1446. Sarro subsequently filed an eight-count Amended Complaint.

Following a hearing on August 13, 2009, the court dismissed Counts III through VIII of Sarro's Amended Complaint. See Aug. 13, 2009 Order. Essentially, the dismissed counts alleged that Philip Morris was liable because its product design was unreasonably

dangerous, since an alternate design for cigarettes would have reduced their propensity to continue to burn when left unattended. See Am. Compl. ¶¶13-39.

Counts I and II were not dismissed. See Aug. 13, 2009 Order. Count I asserts a claim that wilful and wanton conduct by Philip Morris caused Rivers's death. See Am. Compl. ¶3-9. Count II asserts a claim that such wilful and wanton conduct caused property damage to the home co-owned by Rivers and Sarro. See id. ¶¶10-12. Both Counts I and II allege that Philip Morris's marketing practices caused Rivers to begin smoking sometime before her fourteenth birthday on July 31, 1968, and that, as a result of Rivers's addiction to cigarettes, she smoked while intoxicated on December 24, 2004, and accidentally ignited the fire that caused her death.

After discovery, Philip Morris moved for summary judgment on Sarro's remaining claims. A hearing on the motion was held. For the reasons described in this Memorandum, Philip Morris's motion for summary judgment is being allowed because Sarro has not submitted sufficient admissible evidence that Philip Morris engaged in wilful and wanton conduct to permit a reasonable jury to find in her favor.[1]

---

[1] As the parties agree, because the court is concluding that Philip Morris's conduct was not wilful and wanton, the court need not decide Philip Morris's argument that Sarro's claims are preempted by federal law and barred by the First Amendment.

II.  THE SUMMARY JUDGMENT STANDARD

The court may grant summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In addition, the facts must be viewed in the light most favorable to the non-moving party. See Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994). "When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Smith v. Stratus Computers, Inc., 40 F.3d 11, 12 (1st Cir. 1994).

In determining the merits of a motion for summary judgment, the court is compelled to undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. See Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Id. To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [fact

3

finder] could return a verdict for the non-moving party." Id.; see also Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988). The evidence relied upon in performing this analysis must be admissible. See Vazquez v. Lopez-Rosario, 134 F.3d 28, 36 (1st Cir. 1998).

III. DISCUSSION

   A.   Wilful and Wanton Conduct

Plaintiff alleges that, on or before July 31, 1968, Philip Morris engaged in wilful and wanton conduct by advertising Marlboro cigarettes to consumers, including minors. See Am. Compl. ¶¶3-5. Rivers had begun smoking Marlboro cigarettes by approximately July 31, 1968, her fourteenth birthday, allegedly because of Philip Morris's advertising campaign. Id. ¶6. Plaintiff further alleges that Rivers became addicted to cigarettes and that, as a result of her addiction, while in an impaired state on December 24, 2004, Rivers lit a Marlboro cigarette, which caused the fire at her home. See id. ¶¶7-12. Accordingly, the issue is whether plaintiff has submitted sufficient admissible evidence to prove that Philip Morris's advertising and sale of Marlboro cigarettes on or before July 31, 1968, constituted wilful and wanton conduct.

"The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood

4

that substantial harm will result to another." Commonwealth v. Catalina, 407 Mass. 779, 789 (1990).[2] The imposition of tort liability for wilful and wanton conduct can be based on "either a subjective or an objective standard for evaluating knowledge of the risk of harm." Boyd v. National R.R. Passenger Corp., 446 Mass. 540, 546 (2006). Under a subjective standard, the actor knows, or has reason to know, of facts creating a high degree of risk of physical harm to another, and deliberately proceeds to act, or fails to act, with conscious disregard for or indifference to that risk. See id. at 546-47. Under an objective standard, the actor knows, or has reason to know, of facts creating a high degree of risk of physical harm to another, but unreasonably fails to realize the high degree of risk involved. Id. at 547. Under either standard, the risk must be an unreasonable one, and the actor's conduct must involve a risk of harm to others substantially exceeding that necessary to make the conduct negligent. Id. Therefore, wilful and wanton conduct "involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." Sandler v. Commonwealth, 419 Mass. 334, 337 (1995); see also Manning v. Nobile, 411 Mass. 382, 387-88 (1991).

---

[2]The terms "wilful," "wanton," and "reckless" are often used interchangeably. See Manning v. Nobile, 411 Mass. 382, 387 n.3 (1991); Beausoleil v. Massachusetts Bay Transp. Auth., 138 F. Supp. 2d 189, 204 (D. Mass. 2001).

In Massachusetts, summary judgment is seldom sought or granted in actions involving wilful, wanton, or reckless conduct. See Manning, 411 Mass. at 389 (citing Inferrera v. Sudbury, 31 Mass. App. Ct. 96, 103 (1991)). However, that rule is not absolute. Id. Summary judgment on such a claim must be granted if the defendant demonstrates that the admissible evidence is, even when viewed in the light most favorable to plaintiff, insufficient to prove an essential element of the claim. Id.

IV. FACTS

Viewed in the light most favorable to Sarro, the admissible evidence is sufficient to prove the following.

On or before July 31, 1968, Philip Morris advertised and sold Marlboro cigarettes in the United States, intending to cultivate a loyal customer base. See Philip Morris Response to Request for Admission Nos. 2, 5. Cigarettes are now known to be an addictive product, but in the 1960s Philip Morris knew only that cigarette smoking was habit-forming. See Philip Morris Response to Request for Admission No. 9; Mar. 2, 2011 Tr. at 44. Cigarettes can also be a fire hazard if smoked carelessly. See Philip Morris Response to Request for Admission No. 24.

Rivers became addicted to cigarettes during her adolescence. See Report of Dr. Allan Feingold ("Feingold Report") at 73. She began smoking Marlboro cigarettes at age 13. See Mar. 29, 2010 Dep. of Rosalie Sarro ("Sarro Dep.") at 83. Rivers smoked two packs of

cigarettes a day and preferred Marlboros, although she smoked other brands as well. See id. at 85, 89-90. Rivers began drinking alcohol at age 13 and was an alcoholic. See Dep. of Allan Feingold at 59. On several occasions, she received medical treatment for alcohol-related problems. See Sarro Dep. at 228-229. She became intoxicated almost every day and regularly drank until she fell asleep, often while smoking cigarettes. See Feingold Report at 27-28.

On December 24, 2004, Rivers, who had been drinking and had taken barbiturates, fell asleep while smoking a cigarette at home. See Report of the Chief Medical Examiner at 3. The cigarette continued to burn after Rivers fell asleep and ignited a fire in the second floor bedroom of her home. See Report of Malcolm MacGregor at 2-3.[3] The fire killed Rivers and substantially damaged

---

[3] Philip Morris has moved to exclude as unreliable the testimony of Sarro's fire investigation expert, Malcolm MacGregor ("MacGregor"). On April 22, 2010, MacGregor conducted an investigation into the fire's cause and origin. After surveying the site first-hand, he concluded that the fire was caused by a cigarette. Specifically, "[f]actoring the burn patterns going from the least of burn damage to the most," MacGregor first identified the fire's point of origin. Report of Malcolm MacGregor at 2. He then employed a process of elimination to determine that the fire's cause was a dropped cigarette, observing that, "[t]he depth of char and ensuing burn patterns were a text book example of a cigarette or cigar falling onto combustible materials." Id. Accordingly, he concluded: "Based on experience and applying the practices set forth in N.F.P.A. 921, and finding no other source of ignition it can only be concluded that this fire was accidental in nature as a result of smoldering smoking materials dropped onto carpeted flooring." Id. at 3.

This process of elimination substantially conformed to accepted fire investigation protocols. In United States v. Diaz, for example, in affirming an arson conviction, the First Circuit

her home.

As Sarro acknowledged at the March 2, 2011 hearing, the only evidence that Philip Morris was aware prior to July 31, 1968, of smokers ever being seriously injured or killed by cigarette fires is Philip Morris's response to Sarro's Request for Admission Number

---

found no plain error in the admission of experts' cause and origin testimony, since the experts examined first-hand the fire site and refuted alternate explanations, "emphasizing the significance of various burn patterns." 300 F.3d 66, 76 (1st Cir. 2002); see also Travelers Prop. & Cas. Corp. v. Gen. Elec. Co., 150 F. Supp. 2d 360, 366 (D. Conn. 2001) (challenged expert testimony found to be "product of reliable principles and methods" where expert's conclusion was based upon analysis of burn patterns and exclusion of "potential alternative explanations"); Abu-Hashish v. Scottsdale Ins. Co., 88 F. Supp. 2d 906, 910 (N.D. Ill. 2000) (finding expert's conclusion to be a product of scientific method and in conformance with National Fire Prevention Association 921: A Guide for Fire and Explosion Investigations (the "NFPA 921") where, although expert performed no tests and took no samples, conclusion was based on burn patterns and expert's experience).

The use of a process of elimination also has been validated by the NFPA 921, a publication of the National Fire Protection Association that has been hailed as the "gold standard" of fire investigation protocols. McCoy v. Whirlpool Corp., 214 F.R.D. 646, 653 (D. Kan. 2003); see also Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1057-1058 (8th Cir. 2005) (stating that the NFPA 921 "qualifies as a reliable method endorsed by a professional organization"). When a fire's origin is clearly defined, the NFPA 921 permits investigators to determine a fire's cause via a process of elimination, notwithstanding the absence of physical evidence of an ignition source. See NFPA 921 c. 18.2.1. (2008).

The court finds that MacGregor's cause and origin conclusion was "arrived at in a scientifically sound and methodologically reliable fashion." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). Therefore, the evidence provided by MacGregor is admissible under Federal Rule of Evidence 702. Accordingly, Philip Morris's motion to exclude his testimony is being denied.

24. See Mar. 2, 2011 Tr. at 39. That request states:

> On or before December 24, 2004, the defendant had notice of instances where residential fires in the Commonwealth of Massachusetts and elsewhere were caused as a result of the use of a Marlboro or similar cigarette by a person who was intoxicated or otherwise impaired by the concurrent use of alcohol or debilitating substances.

Philip Morris Response to Request for Admission No. 24 (emphasis added). In pertinent part, Philip Morris's response states:

> Philip Morris USA admits that it is aware that there have been public reports of fires allegedly caused by impaired smokers who carelessly discarded lit cigarettes. Philip Morris further admits that it, as well as the general public, has always been aware that the careless use of cigarettes can be a fire hazard because anything that burns, if handled carelessly, can cause a fire.

Id. Sarro's request for admission did not focus on Philip Morris' knowledge as of July 31, 1968, which is the time period relevant to Sarro's wilful and wanton conduct claims. See Am. Compl. ¶¶3-12. Philip Morris's response did not address with particularity its awareness of the risk at issue in 1968. More specifically, Philip Morris's response does not describe either the degree of the risk of which Philip Morris has "always been aware," or state that the risk is one involving death or serious bodily injury, rather than, for example, property damage.

V. ANALYSIS

As indicated earlier, "[t]he essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to

9

another." Catalina, 407 Mass. at 789. For conduct to be "wilful and wanton," a "risk of death or grave bodily injury must be known or reasonably apparent, and the harm must be a probable consequence of the defendant's election to run that risk or of his failure reasonably to recognize it." Sandler, 419 Mass. at 336. As also explained earlier, the imposition of tort liability for wilful and wanton conduct can be based on "either a subjective or an objective standard for evaluating knowledge of the risk of harm." Boyd, 446 Mass. at 546. Under either standard, the risk must be an unreasonable one, and the actor's conduct must involve a risk of harm to others substantially exceeding that necessary to make the conduct negligent. Id. at 547. The Massachusetts Supreme Judicial Court ("SJC") has emphasized the "high evidentiary standard that must be satisfied in order to establish reckless conduct, rather than negligence." Id. at 553.

In this case, there is virtually no evidence, and in any event inadequate evidence, that at any time, including in 1968, Philip Morris deliberately acted in conscious disregard of known facts creating a risk of physical harm to Rivers or others. Therefore, Philip Morris's possible liability must be evaluated under an objective standard, rather than a subjective standard. Philip Morris can be held liable only if the evidence is sufficient to prove that prior to July 31, 1968, it knew, or had reason to know, of facts creating a high degree of risk of physical harm to others,

10

but it did not realize or appreciate the high degree of risk involved, although a reasonable actor in its position would have done so. Id. at 547.

Under the objective standard, Philip Morris is entitled to summary judgment on Sarro's wilful and wanton conduct claims. This case is comparable to Massachusetts cases in which summary judgment has been granted and distinguishable from those in which summary judgment has been denied.

In Manning, an intoxicated guest leaving a hotel party at which alcohol was served was severely injured in an automobile accident while driving home and subsequently sued the hotel. See 411 Mass. at 384-85. The hotel had a policy requiring the presence of its bartenders at parties of more than 35 people. Id. at 388. This policy was ignored by the hotel's catering manager, who allowed 21 bottles of alcohol to be sent without a hotel bartender to the party, which was attended by at least 100 people. See id. at 388-89. During the party, the hotel received complaints of noisy party guests spilling out of the party suite. See id. at 389. However, the SJC held that there was no evidence that the hotel's failure to adhere to its bartending policy constituted wilful and wanton conduct because there was no evidence that the risk of which the hotel should have been aware involved a "high degree of probability" that any guest would seriously injure himself. Id. The defendant's awareness that a guest might become intoxicated and

operate an automobile did not establish the requisite awareness of a "high degree of probability" of "substantial harm." Id. Accordingly, the SJC found that summary judgment for the defendant was justified. Id. at 393.

Similarly, in the instant case, there is no evidence that, in marketing and selling Marlboro cigarettes prior to July 31, 1968, Philip Morris was or should have been aware of a high degree of probability that Rivers, or any other smoker, would develop an addiction, smoke while impaired, and consequently die or be seriously injured by a fire started by a cigarette. Sarro's Request for Admission Number 24, as plaintiff acknowledges, involves the only relevant admissible evidence. See Mar. 2, 2011 Tr. at 39. As explained earlier, that request relates broadly to the period on or before December 24, 2004. There is no evidence in this case showing specifically what Philip Morris knew or should have known prior to July 31, 1968. The evidence is only adequate to prove that Philip Morris now "is aware that there have been public reports of fires allegedly caused by impaired smokers who carelessly discarded lit cigarettes" and that Philip Morris "admits that it, as well as the general public, has always been aware that the careless use of cigarettes can be a fire hazard because anything that burns, if handled carelessly, can cause a fire." Philip Morris Response to Request for Admission No. 24. However, as in Manning, Philip Morris's awareness that an impaired smoker might accidentally

12

ignite a cigarette fire is insufficient to create a triable issue of material fact as to its allegedly wilful and wanton conduct, because it is not adequate to prove awareness of a sufficiently high degree of risk of death or serious bodily injury. See Manning, 411 Mass. at 389. In Manning, the SJC wrote that the plaintiff's "argument amounts to an assertion of two <u>possibilities</u>, the latter contingent upon the former. This by no means establishes the 'high degree of probability . . . . [of] substantial harm' required to prove wilful, wanton, or reckless conduct." <u>Id.</u> (emphasis original). The same is true in the instant case.

This case is also comparable to <u>Sandler</u>. In <u>Sandler</u>, a bicyclist fell and was injured in an unlit tunnel controlled by the state, when his wheel sank into an uncovered 8-inch wide, 12-inch long drain in the tunnel. <u>See</u> 419 Mass. at 335. The evidence indicated that the state "was aware that a risk of harm was created by a chronically unlit tunnel with missing drain covers." <u>Id.</u> at 337. In particular, the state "knew that the lack of a drain cover posed a danger to individuals," and there was evidence that the state "did not respond reasonably." <u>Id.</u> at 338. Nevertheless, the SJC held that the "degree of the risk of injury in this case [did] not meet the standard that [it had] established for recklessness." <u>Id.</u> Rather, it held that a "greater degree of risk of serious injury (dangerousness)" was required. <u>Id.</u> at 339. Accordingly, the SJC held that the case should not have been submitted to a

jury, and that the state's motions for a directed verdict and for judgment notwithstanding the verdict should have been allowed. Id. at 334-35. The standard for obtaining a judgment notwithstanding a verdict in Massachusetts is the same as the summary judgment standard. See Mancuso v. Massachusetts Interscholastic Athletic Ass'n, Inc., 453 Mass. 116, 122 (2009); Anderson, 477 U.S. at 247-48; Smith, 40 F.3d at 12.

Similarly, in the instant case there is no evidence that the known degree of the risk of injury was in 1968 sufficiently high to warrant liability. There is no evidence that Philip Morris knew or should have known that its cigarettes were highly likely to cause accidental fires, or that any such fires were likely to result in death or serious injury. Thus, this case is distinguishable from Boyd, in which a speeding train struck and killed a child bicycling across a grade crossing. See 446 Mass. at 540. The evidence in Boyd indicated that the train had exceeded the federally prescribed speed limit and that the operator failed to sound the train's horn as required by Massachusetts law. See id. at 552. The evidence also indicated that the defendant train company "acknowledged that grade crossings, in particular, are very dangerous places," and that it knew that "pedestrians and bicyclists went around lowered safety gates at grade crossings." Id. at 550. In addition, the SJC noted that "[t]he almost certain outcome of being struck by a high-speed train is either death or grave physical injury." Id. Accordingly,

14

the SJC held that a material issue of fact existed as to whether the defendants acted wilfully and wantonly and, therefore, summary judgment for the defendant was not justified. Id. at 545. However, the SJC also emphasized that its "decision should not be interpreted as diminishing in any way the high evidentiary standard that must be satisfied in order to establish reckless conduct, rather than negligence." Id. at 553. The SJC explained that:

> Here, it is the intersection of multiple factors - the alleged violations of two statutes designed to protect the public from harm (which required the taking of simple precautions to reduce an enormous risk), the extreme danger posed by public grade crossings, the residential character of the neighborhood around the [grade] crossing, the [train company's] awareness that pedestrians and bicyclists sometimes went around lowered safety gates, and the high risk of death resulting from an accident - that creates a triable issue of material fact whether the defendants' conduct was, in fact, reckless.

Id.

In contrast, in the instant case, plaintiff has presented no evidence or argument that Philip Morris violated any statute designed to protect the public from harm. Nor has plaintiff presented evidence of either a high risk of death from accidental cigarette fires, or that prior to July 31, 1968, Philip Morris was or should have been aware that such fires were sufficiently likely to occur.

Therefore, this case is also distinguishable from Catalina, in which a grand jury indicted the defendant for involuntary manslaughter based on testimony that he had sold heroin to an

15

addict who overdosed and died. See 407 Mass. 779. The defendant challenged whether the evidence before the grand jury was sufficient to support a prosecution for involuntary manslaughter, which the SJC defined to include "an unlawful homicide unintentionally caused by wanton or reckless conduct." Id. at 789 (citing Commonwealth v. Welansky, 316 Mass. 383, 399 (1944)). The SJC rejected the defendant's challenge. Id. at 780. It noted that the distribution of heroin is a felony and a "particularly serious crime." Id. at 790. The SJC also cited evidence that "the defendant knew he was distributing a highly potent brand of heroin, that [the user] had a low tolerance for the drug and had overdosed in the past, that she could not handle a whole bag of this type of heroin, and that she needed to be warned not to 'do a whole one.'" Id. at 790 n.12. In addition, the SJC referred to medical studies and statistical data showing that the consumption of heroin is inherently dangerous and carries a high probability of death. See id. at 791. Accordingly, it held that the evidence presented to the grand jury established probable cause to believe the defendant had committed manslaughter by acting wantonly. Id. at 792.

In contrast, the marketing and sale of cigarettes is not a crime. In addition, Sarro has introduced no admissible evidence regarding the fire risks associated with cigarette smoking that is comparable to the medical studies and statistical data cited in Catalina. In this case, no evidence has been presented to prove

16

that cigarettes, like heroin or speeding trains in residential neighborhoods, are inherently or unreasonably dangerous because of the risk of causing fires that would seriously injure or kill people who smoke while drunk. Similarly, there is no evidence that Philip Morris was, or should have been, aware of any such risk of dangerousness on or before July 31, 1968. It is possible that such evidence exists somewhere. However, it has not been presented in this case. The court must decide the defendant's motion for summary judgment based on proferred admissible evidence. See Vasquez, 134 F.3d at 36. The admissible evidence presented here does not meet the high evidentiary standard for creating a triable issue of wilful and wanton conduct.

Accordingly, Philip Morris's Motion for Summary Judgment is being allowed.

III. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Defendant Philip Morris's Motion to Exclude the Testimony of Plaintiff's Expert Malcolm MacGregor (Docket No. 52) is DENIED.

2. Defendant Philip Morris's Motion for Summary Judgment (Docket No. 54) is ALLOWED.

3. Judgment shall enter for Defendant Philip Morris.

                                            /s/ Mark L. Wolf
                                  UNITED STATES DISTRICT JUDGE